```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

                                      CIVIL ACTION
ODYSSEA MARINE, INC.
                                      NO. 16-7722 (Lead)
VERSUS                                C/W 16-13385 (Member)

SIEM SPEARFISH M/V, ET AL.            Applies to: 16-13385

                                      SECTION "J" (4)
```

**REASONS FOR RULING**
**[As to Order setting amount of security (Rec. Doc. 41)]**

On August 4, 2016, the Court heard arguments on Siem Offshore, LLC's ("Siem") Motion to Set Security (Rec. Doc. 27) relating to the arrest of its vessel, M/V SIEM SPEARFISH ("SPEARFISH"), by plaintiff Delta Subsea, LLC ("Delta") in consolidated member case 16-13385. The next day, the Court issued an order setting security at $1,087,741.26, the amount requested by Delta, and stated that written reasons would follow. (Rec. Doc. 41). The Court provides its reasons here.

On or around May 16, 2016, Siem and Delta entered into a Master Service Agreement ("MSA") pursuant to which Delta provided what it calls "ROV support services" to the SPEARFISH. The MSA states that Delta will invoice Siem on a monthly basis and that Siem will pay the undisputed portion of Delta's invoices "within thirty (30) calendar days of receipt of [Delta's] invoice." (MSA § 8.2, Rec. Doc. 34-2). Litigation ensued when Delta allegedly was not paid, or was not fully paid, on one or more of its invoices.

Claiming that its work gave rise to a maritime lien for necessaries under 46 U.S.C. § 31342, Delta sued the SPEARFISH *in rem* and Siem *in personam* on July 28, 2016. The Marshals Service arrested the SPEARFISH the next day. Siem then entered a restrictive appearance to defend against the *in rem* claims. *See* Fed. R. Civ. P. Supp. R. E(8). The parties could not agree on the amount of security required for the release of the SPEARFISH, prompting Siem to file the instant motion under Rule E(5)(a) of the Supplemental Rules for Admiralty and Maritime Claims.[1] (Rec. Doc. 27).

There are five invoices at issue. At the time of the SPEARFISH's arrest, payment on only one of the invoices (Invoice No. 16-01) was due, per the terms of the MSA, in the amount of $99,010.00.[2] As to the other four invoices, 30 days had not yet passed from the time Siem received the invoices; consequently, these debts were not yet mature under the terms of the MSA when the SPEARFISH was arrested.[3]

---

[1] Rule E(5)(a) states, "Whenever process of maritime attachment and garnishment or process in rem is issued the execution of such process shall be stayed, or the property released, on the giving of security, to be approved by the court or clerk, or by stipulation of the parties, conditioned to answer the judgment of the court or of any appellate court. The parties may stipulate the amount and nature of such security. In the event of the inability or refusal of the parties so to stipulate the court shall fix the principal sum of the bond or stipulation at an amount sufficient to cover the amount of the plaintiff's claim fairly stated with accrued interest and costs; but the principal sum shall in no event exceed (i) twice the amount of the plaintiff's claim or (ii) the value of the property on due appraisement, whichever is smaller. The bond or stipulation shall be conditioned for the payment of the principal sum and interest thereon at 6 per cent per annum."

[2] Siem paid a portion of this invoice ($372,348.00) but disputes the balance of $99,010.00.

[3] One invoice was due on August 5. Another invoice is due on August 27 and two others are due on August 30.

Siem argues that the Court should only consider Invoice No. 16-01 when setting the amount of security, because it represents the only maritime lien that could be validly enforced at the time the SPEARFISH was arrested.  Siem contends that the maritime liens associated with the four other invoices were inchoate and unenforceable at the time of arrest.  Siem further argues that by arresting the SPEARFISH for charges not yet due, Delta has waived any potential maritime lien for those charges.  Delta, on the other hand, argues that its maritime liens were enforceable the moment the necessary service was provided to the SPEARFISH, and therefore security should be based on the total amount owed on all of the invoices, which it calculates to be $870,193.01.  Delta urges that while Siem may have a contractual defense that four of the five invoices are premature, that defense only relates to the *in personam* claims against Siem.  Delta claims that the SPEARFISH's *in rem* liability is rooted in statute, not contract, and is independent of the Siem's *in personam* liability and defenses to same pursuant to the concept of vessel personification.

As will be explained below, the Court ultimately agrees with Delta's conclusion.  However, the Court does not agree with Delta's blanket proposition that a necessaries provider may enforce a maritime lien (i.e., arrest a vessel) from the moment the necessary service or supply is rendered, notwithstanding a promise by the provider that the debt is not due until sometime in the future.

3

In *A.L. Veverica v. Drill Barge Buccaneer No. 7*, 488 F.2d 880 (5th Cir. 1974), a plaintiff asserted a maritime lien for salvage and arrested the vessel one month after performing the service, despite agreeing that payment was not due until the vessel owner received insurance proceeds or one year had passed. The court held that "the remedies accorded by the [maritime] lien were suspended until payment was due" and the salvor "had no right during the suspension period to seize the vessel." *Id.* at 882. It relied in part on cases from the 19th century which "recognized that failure to honor an agreed period of credit was a defense to an in rem proceeding. [Those cases] permitted liens subject to an extension of credit, but they treated them as inchoate, remediless liens until the credit periods expired." *Id.* at 884. In *Pan American Bank of Miami v. Oil Screw Denise*, the Fifth Circuit held that a maritime lien for vessel repairs attached the moment the vessel left the repair yard with the bill unpaid, but this did not necessarily mean the lien was enforceable at that time:

> We conclude that the lien attached when the [vessel] left the custody of Tracor with its repair bill unpaid. That arrangements for subsequent payment may have been made is ***material to the time at which the lien might be enforced***, but not to when it comes into being. From the time the [vessel] left Tracor's yard Tracor had a lien. ***That there may have been a credit arrangement making enforcement of the lien premature would not belie existence of the lien.***

4

613 F.2d 599, 602 (5th Cir. 1980) (emphasis added).[4] In a more recent decision, the Fifth Circuit made clear in a case involving breach of a charter party that the point at which a maritime lien attaches and the point at which it becomes enforceable are not necessarily the same. *See Bank One, Louisiana v. Mr. Dean MV*, 293 F.3d 830, 834 (5th Cir. 2002) ("Even though the lien attaches at the beginning of the venture, the inchoate lien cannot permit suit against the vessel *in rem* until 'perfected by a breach of the charter.'"); *see also id.* at 838 ("The maritime lien attaches when the cargo is loaded or the chartered vessel delivered, and continues when the debt perfects (or 'vests') the power to later sue the vessel *in rem*. . . . When the debt arises, what 'arises' is not the lien itself but rather the right to sue *in rem*.").

The Court interprets the above authorities as laying out a general rule (which, as will be seen, is not without exception) for a maritime lien for necessaries, to wit: A maritime lien attaches when the necessary good or service is provided, but the lien typically will remain inchoate and may not be enforced (i.e., the vessel may not be arrested) until the debt has matured per the terms of the agreement (if any). This interpretation is consistent

---

[4] It is important to note that *Oil Screw Denise* concerned vessel repair, which is expressly listed among the "necessaries" that will support a maritime lien under Federal Maritime Lien Act. *See* 46 U.S.C. § 31301(4). One of the ways Delta attempts to distinguish *Buccaneer No. 7* is on the grounds that the case concerned a salvage lien rather than a necessaries lien. *Oil Screw Denise* undercuts this argument.

5

with a basic purpose of the necessaries lien: "to provide security for a claim while permitting the ship to proceed on her way in order to earn the freight or hire necessary to pay of the claim." Robert Force, Fed. Judicial Ctr., *Admiralty and Maritime Law* 184 (2d ed. 2013); *see also Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986) (en banc); *Buccaneer No. 7*, 488 F.2d at 883 ("The very purpose of maritime liens is to encourage necessary services to ships whose owners are unable to make contemporaneous payment. In order to preserve this source of credit, and in order to facilitate ordinary and reasonable commercial practices, we align ourselves with those early cases which held that credit of a duration consistent with the lien does not waive the lien, but merely suspends the remedy on the lien until its expiration." (citation omitted)).[5]

Nevertheless, the Court concludes that given the circumstances surrounding this case it is appropriate to base the amount of security on the total amount of maritime liens that have attached to the SPEARFISH, including those securing debts that had not yet matured at the time of arrest. The circumstances the Court

---

[5] As to Delta's reliance on the concept of vessel personification, and to the extent that argument is not completely foreclosed by the authorities already cited, the Court adds that Delta's blanket proposition regarding lien enforcement stretches the concept beyond its limits. *Cf. Bank One*, 293 F.3d at 832 n.2 (acknowledging Professors Gilmore and Black's critique that the "fiction of the ship's personality has never been much more than a literary them."); Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 586 (2d ed. 1975) ("The law of maritime liens has been plagued by . . . an overdose of theory and a failure to abide by Justice Holmes' admonition that general propositions do not decide concrete cases."); *id.* at 589-90, 613-16.

refers to are: (1) at the time the SPEARFISH was arrested, one of the invoices was due, meaning that arrest was valid at that time with respect to at least one of the invoices; (2) since April 2016, the SPEARFISH has been arrested by five different plaintiffs, not including Delta;[6] (3) according to an affidavit by Delta's Chief Financial Officer, Siem told Delta on July 27, 2016—the day before Delta filed this lawsuit—that Siem intended to take the SPEARFISH out of the area to avoid further arrests (Rec. Doc. 33-1 ¶ 27); and (4) the invoices that are not yet due will be due by, at the latest, the end of this month. The second and third circumstances are, in the Court's view, particularly significant.

Notably, there are significant distinctions between this case and *Buccaneer No. 7* and *Oil Screw Denise*, both discussed above. In *Buccaneer No. 7*, the holder of the inchoate salvage lien was the first party to arrest the vessel, which then prompted lower-ranking lien holders to intervene and assert their liens. In a footnote, however, the circuit indicates that it might have reached a different conclusion regarding the enforceability of the salvage lien had the lower-ranking lienors precipitated the arrest. 488 F.2d at 884 n.5. The fact that the SPEARFISH has recently been arrested by other lien holders before Delta instituted this action appears to bring this matter within the carve out contemplated in

---

[6] C.A. Nos. 16-3603, 16-4302, 16-7722, 16-13305, 16-13469.

*Buccaneer No.* 7.  Furthermore, considering that *in rem* arrest is the first step toward judicial sale, which would wash the vessel of all maritime liens, *see* 46 U.S.C. § 31326; *Bank One*, 293 F.3d at 832, it appears sensible to permit a lien holder to enforce a lien that has attached but not fully ripened once other parties have placed the vessel under arrest.  *Oil Screw Denise* also stops short of establishing an absolute and unyielding rule for maritime lien enforcement.  In that case a term in a ship mortgage made it an act of default if the vessel owner permitted a lien to be placed on the vessel.  *Oil Screw Denise*, 613 F.2d at 601.  The bank arrested the vessel, arguing that the vessel owner defaulted when it permitted a maritime lien for repairs to attach.  This prompted the repair yard to intervene and assert its lien.  On appeal, the vessel owner argued that the mortgage was not in default when the bank arrested the vessel, because the vessel owner had arranged for an extension of credit from the repair yard.  The court merely ruled that the repair lien had attached when the vessel left the repair yard with an unpaid bill and, consequently, the mortgage was in default.  Although the court noted that the extension of credit "is material to the time at which the lien might be enforced," it did not explicitly hold that the repair lien was premature or unenforceable when the repair yard intervened.  *Id.* at 602. In fact, the circuit left intact the district court's judgment in favor of the repair yard against the vessel *in rem*,

possibly indicating that the repair lien could be enforced, despite the unexpired credit period, once the bank arrested the vessel. *See id.* at 600. Therefore, *Oil Screw Denise* also does not control this case. Given that there is no case directly on point from the Fifth Circuit, the Court notes that *Dresdner Bank Ag v. M/V Olympia Voyage*, 465 F.3d 1267 (11th Cir. 2006), supports Delta's position.

For these reasons, the Court concludes that under the circumstances of this case, it is appropriate to base the amount of security on all the unpaid invoices, not just the ones due at the time the SPEARFISH was arrested. Accordingly, the Court has granted Delta's request that security be set at 125% of $870,193.01, or $1,087,741.26.

New Orleans, Louisiana, this 10th day of August, 2016.

_____
United States District Court